1  MANATT, PHELPS & PHILLIPS, LLP
   CHARLES E. WEIR (State Bar No. 211091)
2  E-mail: cweir@manatt.com
   COLIN M. MCGRATH (State Bar No. 286882)
3  E-mail: cmcgrath@manatt.com
   2049 Century Park East
4  Suite 1700
   Los Angeles, California 90067
5  Telephone:  310.312.4000
   Facsimile:   310.312.4224
6
   *Attorneys for Plaintiff*
7  UNITED CARGO MANAGEMENT, INC.

8

9

10              **UNITED STATES DISTRICT COURT**

11             **CENTRAL DISTRICT OF CALIFORNIA**

12                   **WESTERN DIVISION**

13

14  UNITED CARGO MANAGEMENT,          Case No. 2:25-cv-03588
    INC.

15             Plaintiff,

16       v.                          COMPLAINT

17  CARLTON BLAIR III and
    WORLDLOG, LLC,                   DEMAND FOR JURY TRIAL

18
               Defendants.
19

20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Plaintiff UNITED CARGO MANAGEMENT, INC. ("UCM" or "Plaintiff") alleges the following in support of its claims and causes of action against CARLTON BLAIR III ("Blair") and WORLDLOG, LLC ("Worldlog").

## NATURE OF THE ACTION

1.      This is a case about Blair brazenly attempting to steal a division of UCM that he was tasked with running. Blair and his company Worldlog have misappropriated the name, goodwill, trade secrets and corporate information of UCM. Blair instructed UCM employees to send unauthorized communications to UCM clients, partners and vendors. The communications were on UCM letterhead and stated that there were address changes, changes in the executive team, and new banking information for "UCM." In the communications, UCM clients, partners and vendors were instructed to sign a new "Agency Agreement" with what appeared to be UCM. In reality, UCM made none of the changes reflected in the communications. Defendants were attempting to deceive UCM clients, partners and vendors and have them send UCM's money to Defendants' bank accounts and the UCM client business to him and his company Worldlog. When UCM's management became aware of the unauthorized communications and efforts to divert UCM money and property to Defendants, Blair was terminated immediately.

2.      UCM is a global logistics company based in Los Angeles that was founded in 1987. It secures shipping and freight delivery services for its various clients throughout the world. It has three domestic locations (Los Angles, New York and Charleston). Until April 2025, while Blair used various titles, he was the General Manager of the Charleston, South Carolina office.

3.      While he was employed by UCM and in violation of his duty of loyalty, Blair individually and through his company Worldlog worked against UCM's interest in an effort to steal UCM's Charleston division and other assets of UCM for Defendants' business. In furtherance of their scheme, Defendants created separate email and file management systems to which UCM has no access, created websites

using UCM's brand and intellectual property, instructed UCM's Charleston employees to move files to servers and locations controlled by Defendants and not UCM, improperly forwarded UCM emails to their servers, and sought contracts with UCM clients for Defendants' business. Perhaps the most brazen act was Defendants' effort to funnel payments from UCM customers to Defendants' bank accounts. Recent due diligence also reveals that Blair had been entering into deals to benefit himself to the detriment of UCM and misusing UCM funds for personal gain.

4.      UCM brings this suit to enjoin Defendants from continuing to misuse UCM's property and to seek damages for the losses caused by their conduct.

## **THE PARTIES**

5.      Plaintiff UCM is a corporation organized under the laws of the State of California, and has its principal place of business at 12501 Imperial Hwy Ste 310, Norwalk, CA 90650. UCM has been in business as a prominent global shipping and logistics company since April 1987.

6.      Defendant Blair was the General Manager of UCM's Charleston office.  Blair was employed at UCM beginning in approximately April 2008 until his termination in April 2025. On information and belief, Blair resides in or around Charleston, South Carolina.  In his position as General Manager of UCM's Charleston office, Blair oversaw the operations of the Charleston office. Blair was extremely well compensated for his work at UCM via a significant base salary and a profit-sharing arrangement.

7.      Defendant Worldlog is a limited liability company organized under the laws of Wyoming. Worldlog was incorporated on August 30, 2018.  Worldlog's principal place of business is located in Mount Pleasant, South Carolina. UCM was aware that Worldlog existed and that it was owned by Blair, as some of Blair's compensation was paid to WorldLog. However, UCM was unaware that Blair was using WorldLog to compete with UCM and steal UCM property while Blair was an employee for UCM.

**JURISDICTION AND VENUE**

8.     The Court has jurisdiction over UCM's federal claims pursuant to 28 U.S.C. § 1331, because Defendants have acted in violation of the Lanham Act, 15 U.S.C. § 1125 et seq., the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. The Court has supplemental jurisdiction over UCM's state law claims pursuant to 28 U.S.C. § 1367. Alternatively, this Court has subject matter jurisdiction over UCM's state law claims pursuant to 28 U.S.C. § 1332(a) because Defendants are not citizens of the same state as UCM and the matter in controversy exceeds $75,000.

9.     Venue is proper in this District under 28 U.S.C. § 1391(b) insofar as a substantial part of the events or omissions giving rise to the claims occurred in this District, or, alternatively, under 28 U.S.C. §§ 1391(b) insofar as a substantial part of the property that is the subject of the action is situated in the district.

**FACTUAL BACKGROUND**

**UCM's Business and Intellectual Property**

10.     UCM's president and sole shareholder is Thomas Lee ("Lee"). Lee incorporated the company on April 17, 1987. In addition to its California and South Carolina offices, UCM has a third domestic office in Whitestone, New York, and five international branches spanning across Canada, Australia, and China.

11.     UCM operates as a global Non-Vessel Operating Common Carrier ("NVOCC"), operating as an airfreight forwarder and warehouse and distribution provider. UCM's services and staff are integrated across all of its offices, and its global reach allows it to provide highly efficient and effective logistics services.

12.     It is typical in the shipping and freight industry to use agents in regions not served by a company office. UCM has worked with agents or agency partners since its incorporation in 1987. Some agency partners have done business with UCM for many years, whereas other contracts are more recent. UCM has established relationships with agency partners in a variety of ways: some came to

1  the company through freight forwarding networks, some were introduced to UCM,
2  whereas others were recruited or sourced by UCM employees.

3      13.    Agency partners will typically send UCM rate requests for potential
4  business they are working on that require destination services. They also send sales
5  leads for work as a joint business. At other times they will help UCM source rates,
6  space, and other special services in origin countries.

7      14.    UCM has operated under the name "United Cargo Management" and
8  "UCM" for the entirety of its existence. UCM has always used these identifying
9  names in advertisements and customer-facing communications.

10     15.    Through UCM's continuous and exclusive use of the names "United
11 Cargo Management" and "UCM" over 30 years, and for over 17 years in the
12 Charleston, South Carolina market, the term UCM has obtained a secondary
13 meaning for customers. UCM customers and other consumers involved in the
14 logistics industry associate United Cargo Management and UCM with Plaintiff and
15 its logistics services. At various times over the years, UCM has also referred to its
16 Charleston operation as UCM CHS and used that mark in connection with its
17 Charleston operations.

18     16.    On February 12, 2025, UCM filed with the United States Patent and
19 Trademark Office ("USPTO") U.S. Federal Application No. 99039318 for
20 registration of the mark United Cargo Management. That application is still
21 pending with the USPTO. Blair was involved in the filing of this application, and
22 utilized outside counsel to do so, which was billed to UCM.

23     17.    UCM has valid and protectable trademark rights in the names "United
24 Cargo Management," "UCM" and "UCM CHS" (together, the "UCM Marks").

25 **Blair's Employment Relationship with UCM**

26     18.    Blair served as an employee of UCM beginning in approximately
27 April 2008 through his termination from UCM in April 2025. Throughout his
28 employment Blair was compensated both through a regular salary and a profit-

1   sharing arrangement.

2        19.    Lee and Blair executed several short agreements which outline the

3   terms of Blair's compensation and profit-sharing arrangement, most recently in

4   2015. None of these agreements purported to transfer any ownership interest in

5   UCM or UCM's property to Blair.

6        20.    Blair's primary duties as a corporate employee included the

7   management of the Charleston Office. However, he also engaged in tasks that

8   impacted UCM's other offices. For example, at various times, Blair would

9   negotiate and manage contracts with clients and shipping companies that included

10  terms applicable to other UCM offices.

11       21.    At the time of his termination, Blair was compensated at a base salary

12  level of $480,000 annually. Blair also benefited from a profit-sharing arrangement

13  whereby Blair received particular percentages of the profits from the Charlston

14  Office.

15  **Blair's Brazen Attempt to Steal UCM's Charleston Office and Business**

16       22.    Despite Blair's generous salary and profit-sharing arrangement, at

17  some point in 2024 or 2025, Blair decided to take unauthorized steps to appropriate

18  UCM's intellectual property and poach its customer base in the Charleston division.

19       23.    On March 26, 2025, Blair sent Lee a letter that purported to formalize

20  the results of a prior discussion regarding Blair's desire to leave UCM ("Blair's

21  Separation Offer"). Blair's Separation Offer terms were outlandish and were never

22  agreed to by UCM.

23       24.    Blair's Separation Offer would have extinguished all ownership rights

24  held by UCM in the Charleston division and transferred all UCM assets related to

25  that division to Blair. In purported consideration for this transfer, Blair's Separation

26  Offer offered nothing other than the fact that UCM would no longer need to pay

27  him, because he would not be working for UCM anymore.

28       25.    Essentially, Blair's Separation Offer sought to transfer ownership of

the Charleston division and its related assets to Blair in exchange for illusory consideration; illusory, because Blair's voluntary termination as a UCM employee would extinguish the company's obligation to continue compensating him, regardless of whether Blair purported to relinquish a right to compensation. In short, Blair's Separation Offer proposed that Blair would take the Charlston division of UCM and UCM would receive nothing in return. Obviously, UCM did not agree to those terms.

26.    Despite the fact that there was no agreement, Blair decided to take steps to seize the Charleston division anyway.

27.    On March 28, 2025, at Defendants' urging, all or nearly all of the employees at the Charleston office resigned, with a purported effective date of April 30, 2025. On information and belief, Blair made misrepresentations to the Charleston workforce that he would be taking over the Charleston division from UCM and that they should follow him.

28.    On March 29, 2025, Blair emailed Lee again with a bullet-pointed list of the terms of Blair's Separation Offer as he saw them. In this email, he told Lee that he was "offering [Lee] a seamless transition agreement between both parties United Cargo Management Inc [sic] and Worldlog aka UCM CHS." In sending this email, Blair apparently understood that Lee had not yet accepted his outlandish offer.

29.    UCM has never granted Defendants the right to operate under the UCM name or use UCM's intellectual property.

30.    At some point while employed by UCM, Blair helped create the website www.ucmchs.com that was used for UCM's Charleston operations.  Blair used the www.ucmchs.com address in connection with his work for UCM. That site and its contents belong to UCM. Worldlogllc.com was never a UCM site. Recently, Defendants created or revised the website www.worldlogllc.com. The www.worldlogllc.com site is nearly identical to the www.ucmchs.com site. UCM

currently has no control over those websites. To further their scheme, Defendants have been using them to create the appearance that Worldlog is affiliated with UCM.

31.    For example, the Worldlog website claims that it was established in 1987 and has offices in Canada and China, just like UCM. The website continues to use the same or very similar names and images to the UCM Marks, and nowhere mention that "Worldlog" is not affiliated with UCM.  Moreover, the www.worldlogllc.com website links to documents titled "FMC Rules Tariff" and "Bill of Lading Terms and Conditions" which state that Worldlog, LLC is doing business as UCM.

32.    As for the www.ucmchs.com site, Defendants have seized access of the site and UCM currently has no control over its content. Defendants continue to misuse that site to further confuse the public that their operation of use of the ucmchs.com site is authorized by UCM, when it is not. Control of the site should be returned to UCM immediately.

33.    Blair also directed the creation of a "UCM CHS" email server and domain name, and directed the UCM employee who oversees the company's email system to have all emails sent to the Charleston office forwarded to this non-UCM server, without disclosing this instruction to UCM ownership. UCM ownership learned of this effort only when they were informed by the employee who received Blair's request.

34.    Blair also directed UCM employees to migrate UCM's actual client, vendor, and shipping files to a new system that UCM would not have access to. UCM attempted to address these issues with Blair to stop his theft, but UCM has been unable to do so, and at least some files have already been migrated or copied to Blair's non-UCM system.

35.    Blair also directed UCM employees to email existing UCM clients, vendors and partners doing business with the Charleston office, deceptively

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

7

1  prompting them to take certain actions to move their business to Blair and

2  Worldlog.

3      36.    Specifically, on approximately April 12, 2025, UCM's Import

4  Customer Service Manager emailed UCM's agent partners with an email

5  announcing a new website, change of address, and updated employee emails at the

6  non-UCM server. The update was described as "some exciting news about UCM!"

7  An image of relevant portions of the email is below:

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Saturday, 12 April 2025 3:35 am
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** UCM Important Announcement- Agent Partners

Dear Agent Partners.

We have some **exciting news** about **UCM**!  Attached you will find:

- **UCM ANNOUNCEMENT**
- **UCM Contact List**
- **UCM Agency Agreement**
- **MBL instructions**
- **UCM Banking details**

In order for our growth and support for our customers' needs, this change, and our partnership with you, puts us in a position to fully achieve that goal.

We are grateful for your support and execution which delivers on **our promise of service excellence for our customers.**

**Pls take note of the changes and information so we can work in a seamless manner.**

**These changes are Effective May 1, 2025.**

21      37.    The April 12, 2025 email prompted customers to execute a new

22  Agency Agreement and direct payments for UCM to a new bank account controlled

23  by Blair and Worldlog.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

8

38.    The email also included a link to several documents, including one titled "UCM ANNOUNCEMENT", which included a large UCM header at the top and the language "IMPORTANT CHANGES FOR YOUR IMMEDIATE ATTENTION" highlighted in bold at the top of the page:



39.    The "UCM ANNOUNCEMENT" document directed customers to the www.ucmchs.com website and new office address:

We're writing to let you know about some important changes to where you find us and how you reach us.

As we have continued to grow, our office didn't, so we recently packed up our old space and moved into a beautiful new location that gives us more room to get work done for you. Whether you're planning to pay us a visit or send us some regular mail, **please be sure to make note of our new address:**

**United Cargo Management**
**126 Seven Farms Drive**
**Suite 260**
**Charleston, SC 29492**

We have also made some enhancements to our online presence so our email information now aligns with our newly refreshed website. As before, we can still be found at www.ucmchs.com and now each of our email addresses reflect that same domain. Same staff, same responsiveness, same customer service, same operations, just a slight change to reflect continuity between our site and our mailboxes.

40.    The email and linked documents also prompted customers to execute a new Agency Agreement and direct payments for UCM to a "new" bank account. On information and belief, the "new" bank account provided in the announcement is controlled by Blair and/or Worldlog.

41.    The email and linked documents indicated that completing the new agency agreement and directing payments to the "new" bank account was necessary to continue doing business with UCM. Below is an example of language from the

1  "UCM ANNOUNCEMENT" document and email body stating the changes were

2  necessary:

3

4  Some of these changes will necessitate changes to our paperwork with you. You will find those attached
   herein, so please be sure to review and return as indicated.

5

6  **ACTION:**
   **Please fill out the AGENCY AGREEMENT and return to Hank Harden (Hank.H@ucmchs.com).**

7

8  • **We will be in touch with specific details on effected shipments and more information about this transition.**

9  • **We will be in touch with your financial team to ensure the debits and credits for specific shipments are handled correctly.**

10

11

12      42.    At no point in any of these communications were customers made

13  aware that they were actually being requested to transfer their business away from

14  UCM, to a new company called Worldlog controlled by Blair. The title "UCM" and

15  the words "United Cargo Management" were used throughout, with no mention

16  whatsoever of Worldlog anywhere in the communications.

17      43.    One client reached out to UCM ownership after receiving these

18  communications to confirm whether the communications were legitimate, and

19  whether they were required to sign a new agency agreement after their many years

20  of business with UCM.

21      44.    Furthermore, in the Agency Agreement Blair distributed, the Worldlog

22  entity masquerading as "UCM CHS" purported to be operating under the NVOCC

23  license for UCM. Thus, Worldlog appears to be operating or attempting to operate

24  without a license.

25      45.    Upon receipt of the email, Lee immediately began to receive questions

26  from customers and other partners who were confused by the Defendants'

27  unauthorized requests and misleading use of UCM's branding to try to steal

28  customers and money that belong to UCM.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

46.    On approximately April 21, 2025, UCM received a check for payment from a UCM client, but when UCM tried to enter the payment into its accounting system, it discovered that the client's invoices in the UCM accounting system had already been cancelled out by employees at UCM's Charleston office.

47.    On information and belief, Blair has directed employees at UCM's Charleston office to cancel client invoices for payments owed to UCM, and is now deceiving UCM clients by directing them to send payments to new bank accounts controlled by Defendants without disclosing that those accounts are not UCM accounts, but accounts controlled by Defendants.

**Defendants' History of Self-Dealing**

48.    Defendants efforts to commandeer UCM's Charleston division's business and the UCM brand is what prompted the complaint. Additionally, recent further investigation by UCM of Blair's past conduct has uncovered several other self-dealing actions by Blair at the expense of UCM.

49.    Blair has repeatedly submitted personal expenses as reimbursable expenses.

50.    Shockingly, Blair also failed to disclose to UCM that he is the owner of a property recently leased by UCM as new office space for the Charleston office.

51.    The lease contains above market rent terms that are designed to enrich Blair to the detriment of UCM.

52.    After entering into the lease for the new office space in September 2024, Blair submitted to UCM an office expense of over $580,000. This expense request was also not consistent with market rates and was again designed to merely enrich Blair.

53.    Blair also had a history of negotiating deals with UCM clients to benefit himself to the detriment of the company. As part of his job duties, Blair was responsible for managing some of UCM's relationships across all of its offices. However, because Blair received a higher percentage of profit share from business

at the Charleston office than from UCM's other offices, Blair would direct business to Charleston in ways that hurt UCM as a whole, but benefited himself.

54.    In some cases, Blair directed UCM staff in Charleston not to answer questions and emails from other UCM offices.

55.    In order to stop Defendants' ongoing and unauthorized use of its trademarks and attempts to steal its business, as well as ensure that its customers are not deceived into changing their business away from UCM, UCM was forced to bring this complaint. UCM seeks to enjoin Defendants' wrongful conduct going forward and to recover for harm already done to its company by Defendants.

## FIRST CLAIM FOR RELIEF

### (For Trademark Infringement Under the Lanham Act, 15 U.S.C. § 1125(a))

### (Against Both Defendants)

56.    UCM incorporates by reference all paragraphs above as though set forth completely within this section.

57.    UCM has operated under the names "United Cargo Management" and "UCM" (the "UCM Marks") for the entirety of its existence. Through UCM's continuous and exclusive use of the UCM Marks over almost 30 years, and due to the substantial investment in marketing UCM under the UCM Marks, the terms "UCM" and "United Cargo Management" have obtained a secondary meaning for customers. UCM customers and other consumers involved in the logistics industry associate the UCM Marks with Plaintiff and its logistics services.

58.    Up until Defendants' unauthorized use of the UCM Marks, UCM's use of the UCM Marks was exclusive during the lifetime of the company.

59.    Defendants' use of the terms "UCM" and "United Cargo Management" in emails to customers requiring them to take certain actions to change their business to Blair and Worldlog, and use of the UCM Marks at the websites www.ucmchs.com and www.worldlogllc.com, are confusingly similar and likely to cause customer confusion.

60.    Customers have already been confused by Defendants' unauthorized use of the UCM Marks, and have reached out to Lee about Defendants' misleading use of the UCM Marks to clarify whether the communications they received containing the unauthorized use of the UCM Marks were legitimate.

61.    Defendants' use of the UCM Marks is in the exact same industry as UCM and are being used in communications and marketing materials targeting existing UCM clients, vendors and partners.

62.    Defendants intentionally used the UCM Marks in a context that made their use confusingly similar to the way that UCM uses its name in connection with advertising and customer communications.

63.    Defendants' use of the UCM Marks is likely to confuse, mislead, or deceive customers, purchasers, and members of the general public as to the origin, source, sponsorship, or affiliation of Defendants' products and services, and is likely to cause such people to erroneously believe that Defendants' services have been authorized, sponsored, approved, or licensed by UCM, or that Defendants are in some way affiliated with UCM—even though Worldlog is an entirely separate entity and Blair's employment at UCM has now been terminated. Defendants' acts constitute false or misleading descriptions and representations, false advertising and false designations of the origin of Defendants' goods or services, and unfair competition, all in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

64.    Defendants intentionally and willfully used the UCM Marks and UCM's reputation and goodwill for their own enrichment and to UCM's detriment. Defendants' conduct is malicious, willful, and wanton.

65.    UCM has suffered and will continue to suffer irreparable harm for which it had no adequate remedy at law as a result of Defendants' continuing infringing activities.

66.    The actions of Defendants, if not enjoined, will continue.

67.    Pursuant to 15 U.S.C. § 1116(a) and 1118, UCM is entitled to a

rebuttable presumption of irreparable harm upon a finding of a violation in this action, and on this basis seeks, inter alia, a permanent injunction including, but not limited to an order of destruction or deletion of all infringing uses of the UCM Marks, including the use of the UCM Marks in online advertising and any webpages maintained by Defendants.

68.    UCM seeks and is entitled to treble damages, treble Defendants' profits, costs, and recovery of attorney fees, as provided in 15 U.S.C. 1117(a).

## SECOND CLAIM FOR RELIEF

### (For Federal Cyber Piracy Under the Lanham Act, 15 U.S.C. § 1125(d))

### (Against Both Defendants)

69.    UCM incorporates by reference all paragraphs above as though set forth completely within this section.

70.    While a UCM employee, Blair registered the domain name www.ucmchs.com and developed the website to which it resolves, using UCM's trademarks and business information. As detailed above, the www.ucmchs.com website is the property of UCM, yet the Defendants have control of the site and are using it as if they own it and to direct business to themselves using UCM's name and trademarks.

71.    The domain name www.ucmchs.com incorporates the UCM Marks.

72.    Blair's employment at UCM was terminated in April 2025, but Defendants continue to traffic in and use the domain name www.ucmchs.com.

73.    Defendants' use of the domain name www.ucmchs.com is likely to confuse or deceive customers into believing there is an association or affiliation between Defendants on the one hand, and UCM on the other hand, where there is none. In registering and using the domain names www.ucmchs.com and www.worldlogllc.com, Defendants had, and continue to have, a bad faith intent to profit from the UCM Marks and their goodwill, which belong to UCM.

74.     Defendants continue to use the domain names www.ucmchs.com and www.worldlogllc.com without UCM's authorization, and in a bad faith attempt to profit from UCM's trademarks and to deceive customers, in violation of 15 U.S.C. § 1125(d).

75.     The UCM Marks were distinctive and famous at the time Blair registered the domain names and remain so today.

76.     The domain names www.ucmchs.com and www.worldlogllc.com both resolve to a website currently controlled by Defendants.

77.     Defendants' continued unlawful use of the domain names infringes the UCM Marks, and irreparably injures UCM's business, reputation, and goodwill. Unless Defendants are enjoined from their wrongful conduct, UCM will continue to suffer irreparable harm for which it had no adequate remedy at law, as a result of Defendants' continuing infringing activities.

78.     Pursuant to 15 U.S.C. § 1116(a), UCM is entitled to a rebuttable presumption of irreparable harm upon a finding of a violation in this action, and on this basis seek, inter alia, a permanent injunction including, but not limited to, an order of forfeiture of the domain names, and that Defendants transfer the domain names and websites to which they resolve, to UCM.

79.     UCM seeks and is entitled to treble damages, treble Defendants' profits, costs, and recovery of attorney fees, as provided in 15 U.S.C. 1117(a).

## THIRD CLAIM FOR RELIEF

### (For Theft of Trade Secrets, 18 U.S.C. §§ 1832, 1836

### (Against Both Defendants)

80.     UCM incorporates by reference all paragraphs above as though set forth completely within this section.

81.     UCM's confidential customer list and file, the confidential file it maintains on vendors, its shipping files, and other confidential financial, business, technical, and economic information of UCM, including information about its

existing contracts and services (together, the "UCM Trade Secrets"), constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

82. UCM took reasonable measures to keep the UCM Trade Secrets confidential and secret, including, for example, by putting such information in a secure database accessible only by a limited number of UCM employees, including Blair.

83. On information and belief, Defendants intended to convert and did convert the UCM Trade Secrets, both before and after Blair's resignation as an employee of UCM and all the while continuing to receive a salary from UCM.

84. The UCM Trade Secrets converted by Defendants are related to UCM's products and services and were used in and intended to be used for UCM's service offerings to its clients in interstate commerce, as UCM does business with clients all across the United States.

85. On information and belief, Defendants knowingly stole the UCM Trade Secrets by accessing, downloading, and taking from UCM's computer database, certain customer lists and vendor files, which Defendants then used to contact customers and poach their business.

86. UCM then migrated some of UCM Trade Secrets to a new system that UCM can no longer access.

87. On information and belief, Defendants intended to injure UCM and knew that Blair's theft of the UCM Trade Secrets would injure UCM.

88. On information and belief, Defendants intended to convert the UCM Trade Secrets for their own economic benefit, and not that of UCM.

89. The UCM Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

90. UCM was harmed and Defendants were unjustly enriched by their

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

16

conduct.

91.    Without injunctive relief, Defendants will continue to benefit while UCM continues to suffer irreparable harm, damage and injury. Accordingly, the court should direct Defendants to provide access to all the information migrated from UCM's servers to servers controlled by Defendants, to refrain from using or disclosing UCM's trade secrets and proprietary and confidential information, and to refrain from destruction of such information, as provided in § 1836(b)(3)(A).

92.    Defendants should compensate UCM for UCM's actual losses and for any unjust enrichment to Defendants, as provided in § 1836(b)(3)(B).

93.    UCM is also entitled to reasonable attorney's fees and costs.

94.    Defendants willfully and maliciously misappropriated UCM's trade secrets. UCM should recover exemplary damages in an amount sufficient to deter Defendants and other persons similarly situated from engaging in similar conduct in the future. Accordingly, UCM seeks exemplary damages of two times the amount of damages awarded for UCM's losses and Defendants' unjust enrichment, as provided in § 1836(b)(3)(C).

### FOURTH CLAIM FOR RELIEF

**(For Violations of Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g)**

**(Against Both Defendants)**

95.    UCM incorporates by reference all paragraphs above as though set forth completely within this section.

96.    UCM's computers are involved in interstate and foreign commerce and communication and are protected computers under 18 U.S.C. Section 1030(e)(2).

97.    UCM is informed and believes and on that basis alleges that Defendants knowingly and intentionally accessed UCM's computers without authorization or in excess of authorization.

98.    UCM is informed and believes and on that basis alleges, that Defendants thereby obtained information from UCM's computers.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

17

99.    UCM's computers are "protected computers" in that they are used in or affecting interstate or foreign commerce or communication.

100.    On information and belief, Defendants' conduct caused UCM a loss of over $5,000 in a one-year period.

101.    As a proximate result of Defendants' wrongful conduct, UCM suffered and continues to suffer significant damage and irreparable harm.  Therefore, UCM seeks an award of compensatory damages, as provided in 18 U.S.C. § 1030(g).

**FIFTH CLAIM FOR RELIEF**

**(Misappropriation of Trade Secrets, CUTSA, Cal. Civ. Code § 3426 et seq.)**

**(Against Both Defendants)**

102.    UCM incorporates by reference all paragraphs above as though set forth completely within this section.

103.    UCM alleges a violation of the CUTSA, Cal. Civ. Code § 3426 et seq. for the misappropriation of the UCM Trade Secrets, which constitute proprietary and confidential information.

104.    UCM owns the UCM Trade Secrets misappropriated by Blair when Blair directed UCM employees to migrate client, vendor, and shipping files, and other proprietary and confidential information, to a new system that UCM can no longer access.

105.    The UCM Trade Secrets Blair misappropriated derive independent economic value for UCM because they are not generally known to, and not readily ascertainable through proper means by, a competitor.

106.    Blair was, or at very least should have been, aware at the time that he improperly migrated the files to a system inaccessible to UCM that those files contained the UCM Trade Secrets, which constitute proprietary and confidential information. Blair did not migrate the files for any business purpose of, or benefit to, UCM, and in fact did so to deprive UCM of its valuable trade secrets.

107.    On information and belief, UCM alleges that having taken UCM's

client, vendor and shipping file for its Charleston division, Defendants are now using the UCM Trade Secrets to generate revenue from UCM clients. Moreover, Defendants will continue to use the UCM Trade Secrets in the future to enrich themselves at UCM's expense.

108.   As a result of the foregoing allegations, Defendants have wrongfully misappropriated the UCM Trade Secrets, and have placed UCM at significant risk that they will use or disclose such information to their benefit and to the detriment of UCM. Defendants continue to use the misappropriated information to poach UCM's clients and undermine UCM's business.

109.   The foregoing conduct of Defendants in wrongfully converting and misappropriating the UCM Trade Secrets was knowing, willful, malicious, fraudulent and oppressive. Their actions as set forth herein constitute actual and threatened misappropriation under the CUTSA, Cal. Civ. Code §3426 *et seq.*

110.   As a direct and proximate result of Defendants' actions, UCM has been damaged, has suffered irreparable harm, and will continue to suffer irreparable harm without relief from this Court. Defendants were unjustly enriched by their conduct. Defendants should compensate UCM for UCM's actual losses and for any unjust enrichment to Defendants, as provided in § 3426.3(a).

111.   Without injunctive relief, Defendants will continue to benefit while UCM continues to suffer irreparable harm, damage and injury. Accordingly, the court should direct Defendants to provide access to all the information migrated from UCM servers to servers controlled by Defendants, to refrain from using or disclosing the UCM Trade Secrets and any other proprietary and confidential information belonging to UCM, and to refrain from destruction of such information, as provided in § 3426.2(c).

112.   UCM is also entitled to reasonable attorney's fees and costs.

113.   Defendants willfully and maliciously misappropriated the UCM Trade Secrets. UCM should recover exemplary damages in an amount sufficient to deter

Defendants and other persons similarly situated from engaging in similar conduct in the future. Accordingly, UCM seeks exemplary damages of two times the amount of damages awarded for UCM's losses and Defendants' unjust enrichment, as provided in § 3426.3(c).

## SIXTH CLAIM FOR RELIEF

### (Breach of Duty of Loyalty)

### (Against Carlton Blair III)

114.   UCM incorporates by reference all paragraphs above as though set forth completely within this section.

115.   Blair was employed as the manager of UCM's Charleston division. As an employee and agent of UCM, Blair owed UCM an undivided duty of loyalty, and to avoid taking any action inimical to the best interests of the employer.

116.   Blair breached his duty of loyalty by knowingly and intentionally directing UCM agency partners to sign new agency agreements, and direct their payments to bank accounts controlled by him.

117.   As described in detail in the preceding paragraphs of this Complaint, Blair also breached his duty of loyalty by entering into agreements that benefited himself to the detriment of UCM and misusing company funds.

118.   As a direct and proximate result of Blair's breaches of the duty of loyalty as alleged herein, UCM suffered substantial damages and pecuniary loss in an amount to be proven at trial.

119.   Blair's conduct was done willfully and wantonly in conscious disregard of the unjustifiable and substantial risk of significant financial harm to UCM.

120.   Blair's conduct as alleged herein constitutes clear and convincing evidence of outrageous, oppressive, and malicious conduct pursuant to Code of Civil Procedure § 3294. UCM seeks actual damages and an award of punitive damages against Blair in an amount sufficient to deter him from future similar conduct.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

20

## SEVENTH CLAIM FOR RELIEF

### (Interference with Contractual Relations)

### (Against Both Defendants)

121.   UCM incorporates by reference all paragraphs above as though set forth completely within this section.

122.   UCM has contracts with agency partners in order to service regions not served by a company office. UCM has worked with agency partners since its incorporation in 1987.

123.   Since its incorporation, UCM has also had contracts with clients to provide shipping and freight delivery services.

124.   Blair had knowledge of UCM's contracts and agreements with its agency partners and clients.

125.   Defendants intended to disrupt the performance of these agreements between UCM and its agency partners by deceiving and coercing UCM's agency partners to sign new agency agreements with entities controlled by Defendants and not UCM, and to direct payments to Defendants instead of to UCM. These communications and efforts by Defendants have created confusion among UCM's agency partners and have harmed UCM's business reputation.

126.   On information and belief, Blair directed employees at UCM's Charleston office to cancel payment of invoices owed to UCM, and is now directing clients to send payments to new bank accounts controlled by Defendants.

127.   On information and belief, certain clients for shipping and freight delivery services, or agency partners, have already made payments to Blair or Worldlog, that were owed to UCM.

128.   As a proximate result of Blair's interference and conduct as set forth above, UCM has been deprived of payments and will incur additional damages, costs and expenses in order to replace the services provided by its agency partners.  UCM has been damaged in an amount uncertain at this time.  UCM will seek leave to amend

1    this Complaint when the exact amount of such damages becomes known.

2    129.   On information and belief, Blair engaged in such wrongful interference

3    with intent to injure UCM, or with a willful and conscious disregard of UCM's rights.

4    130.   Defendants' wrongful interference constitutes clear and convincing

5    evidence of outrageous, oppressive, and malicious conduct pursuant to Code of Civil

6    Procedure § 3294. UCM seeks actual damages and an award of punitive damages

7    against Defendants in an amount sufficient to deter them from future similar conduct.

8    **EIGHTH CLAIM FOR RELIEF**

9    **(Intentional Interference with Prospective Economic Relations**

10    **(Against Both Defendants)**

11    131.   UCM incorporates by reference all paragraphs above as though set forth

12    completely within this section.

13    132.   UCM has worked with agency partners since its incorporation in 1987,

14    and has established economic relationships with its agency partners.

15    133.   UCM has provided shipping and freight delivery services to clients since

16    its incorporation in 1987, and has established economic relationships with its clients.

17    134.   UCM's relationships with agency partners are likely to result in

18    economic benefit to UCM through generation of new business and providing cost

19    savings. UCM's agency partners have frequently sent UCM rate requests for

20    potential business they are working on that require destinations services. They also

21    have sent UCM sales leads to work on with UCM as a joint business. They also have

22    helped UCM source rates, space, and other special services at origin countries,

23    agency partners help UCM save costs and generate new business.

24    135.   UCM's relationships with clients are likely to result in economic benefit

25    to UCM. Clients provide revenue to UCM and are the purchasers of UCM's services.

26    UCM invoices its clients for services provided, and clients make payments to UCM

27    based on those invoices and the services provided by UCM.

28    136.   During the time outlined above, Blair was deeply involved with UCM's

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

22

business, and as manager of UCM's Charleston division, was in close communication with UCM's agency partners and clients.

137.    Blair was aware of the existence of the relationships between UCM and its agency partners and clients, and that they were likely to result in economic benefit to UCM.

138.    Blair used his knowledge of UCM's economic relationship with its agency partners to deceptively and fraudulently direct UCM's agency partners to sign new agency agreements with Defendants and make payments of funds meant for UCM to bank accounts controlled by Defendants.

139.    Blair used his knowledge of UCM's economic relationship with its clients to deceptively and fraudulently cancel client invoices and direct UCM's clients to make payments of funds meant for UCM to bank accounts controlled by Defendants.

140.    Blair took these steps intending to disrupt these economic relationships between UCM and certain clients and agency partners or knowing that such disruption was certain or substantially certain to occur.

141.    On information and belief, certain agency partners have in fact signed the new agency agreement proposed by Defendants and directed their business toward Defendants instead of UCM.

142.    On information and belief, certain clients have in fact sent payments owed to UCM to bank accounts controlled by Defendants.

143.    But for Defendants' actions, UCM is informed and believes, and on that basis alleges, that it would have formed and continued to have economic relationships with certain agency partners or clients that were the target of Defendants' efforts.

144.    Defendants' actions constitute intentional and unjustified interference with UCM's business relationship with its agency partners and clients.

145.    Defendants engaged in such intentional interference with intent to injure UCM, or with a willful and conscious disregard of UCM's rights.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

23

146. Defendants' intentional interference constitutes clear and convincing evidence of outrageous, oppressive, and malicious conduct pursuant to Code of Civil Procedure § 3294. UCM seeks actual damages and an award of punitive damages against Defendants in an amount sufficient to deter them from future similar conduct.

## NINTH CLAIM FOR RELIEF

### (Conversion)

### (Both Defendants)

147. UCM incorporates by reference all paragraphs above as though set forth completely within this section.

148. Defendants have converted property from UCM, including but not limited to, specific sums of money owed to UCM by UCM customers (the "UCM Funds") as well as customer, vendor and shipping files (the "UCM Files"). Defendants substantially interfered with UCM's possession and use of its customer, vendor, and shipping files by taking possession of, preventing UCM from accessing, or refusing to return the files when Defendants migrated this information to another system inaccessible to UCM.

149. UCM did not consent to Defendants' possession of, refusal to return, the UCM Funds or the UCM Files. .

150. UCM was harmed by Defendants' possession of, refusal to return, or prevention of UCM from accessing the UCM Funds and UCM Files.

151. Defendants' conduct was a substantial factor in causing UCM's harm.

152. UCM is entitled to the return of the UCM Funds and the UCM Files.

153. Defendants' conduct as alleged herein constitutes clear and convincing evidence of outrageous, oppressive, and malicious conduct pursuant to Code of Civil Procedure § 3294. UCM seeks actual damages and an award of punitive damages against Defendants in an amount sufficient to deter them from future similar conduct.

1

**TENTH CLAIM FOR RELIEF**

2

**(Common Law Fraud)**

3

**(Both Defendants)**

4   154.   UCM incorporates by reference all paragraphs above as though set forth

5   completely within this section.

6   155.   As detailed above, Defendants made numerous misrepresentations to

7   and concealed numerous material facts from UCM in an effort to take UCM's

8   property.

9   156.   UCM justifiably relied upon Defendants' representations and that he

10   would disclose relevant material facts to UCM.

11   157.   As a direct and proximate result of Defendants' misrepresentation and

12   concealment, UCM has been damaged and suffered irreparable harm.

13   158.   Defendants' conduct as alleged herein constitutes clear and convincing

14   evidence of outrageous, oppressive, and malicious conduct pursuant to Code of Civil

15   Procedure § 3294. UCM seeks actual damages and an award of punitive damages

16   against Defendants in an amount sufficient to deter them from future similar conduct.

17

**ELEVENTH CLAIM FOR RELIEF**

18

**(Unfair Competition Law Section 17200)**

19

**(Both Defendants)**

20   159.   UCM incorporates by reference all paragraphs above as though set forth

21   completely within this section.

22   160.   The Unfair Competition Law ("UCL"), California Business &

23   Professions Code Section 17200 *et seq.*, prohibits acts of "unfair competition,"

24   including "any unlawful, unfair or fraudulent business act or practice."

25   161.   Defendants have committed "unfair competition" within the meaning of

26   the UCL by engaging in, *inter alia* and without limitation, the following acts:

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

25

A. Fraudulently representing to existing UCM customers that the entity controlled by Defendants is the same entity as UCM or affiliated with UCM;

B. Using UCM's image and brand to lure customers into depositing funds intended for UCM into Blair and Worldlog's accounts;

C. Migrating UCM's customer, vendor and shipping files for the Charleston division into a new database inaccessible to UCM.

162. UCM has been, and continues to be, harmed by Defendants' unlawful, unfair or fraudulent business act or practice. The harm to UCM outweighs any possible utility of Defendants' acts.

163. UCM has standing under the UCL to bring this claim because it has suffered economic injury in fact as result of Defendants' unfair competition. Specifically, it has lost money or property in the form of missed payments to UCM accounts.

164. UCM is at risk of losing its entire Charleston division and customer base as a direct result of Defendants' acts of unfair competition.

165. UCM seeks and is entitled to permanent injunctive relief under California Business & Professions Code § 17203 prohibiting Defendants from continuing the practices described above, and providing restitution to UCM for the harms caused by Defendants' acts of unfair competition.

## TWELFTH CLAIM FOR RELIEF

### (Unfair Competition Law Section 17500)

### (Both Defendants)

166. UCM incorporates by reference all paragraphs above as though set forth completely within this section.

167. The UCL, California Business & Professions Code Section 17500 *et seq.*, prohibits the making of statements which are "untrue or misleading."

168. Defendants have made misleading statements to UCM customers and

agency partners indicating that the entity styled as UCM CHS is a part of UCM, whereas in reality it is Worldlog doing business under another name.

169. These statements include the use of UCM's trademark, and the description of the change in Charleston division employee emails to match the www.ucmchs.com domain name, and the direction to complete a new agency agreement and send the payments Blair-controlled accounts as "some exciting new about UCM."

170. A reasonable customer would be deceived by these statements and representations, and believe that the entity they were doing business with had not changed.

171. UCM has standing under the UCL to bring this claim because it has suffered economic injury in fact as a result of Blair and Worldlog's unfair competition. Specifically, UCM has lost money or property in the form of missed payments to UCM accounts and payments meant for UCM directed instead to Defendants' accounts.

172. Moreover, the loss of money or property was due to Defendants' false advertising and holding themselves out as UCM CHS. Because Defendants created a website, continued to use letterhead with the "United Cargo Management" and "UCM" names, and represented themselves publicly as "United Cargo Management", "UCM", or "UCM CHS", on information and belief, certain customers have directed payments intended for UCM into accounts controlled by Blair and Worldlog.

173. UCM is entitled to and seeks permanent injunctive relief under California Business & Professions Code § 17203 prohibiting Defendants from continuing the practices described above, and providing restitution to UCM for the harms caused by Defendants' acts of unfair competition.

# **PRAYER**

**WHEREFORE**, UCM prays for relief as follows:

A. Permanent injunctive relief as follows:

    i.   Enjoining Defendants from using the UCM Marks in any way, including in online advertising, customer communications, and websites maintained by Defendants;

    ii.  Requiring Defendants to return control of the domain name www.ucmchs.com, and transfer control of the website to which it resolves, to UCM;

    iii. For the website www.worldlogllc.com, to remove all references to UCM or the UCM Marks and to cease suggesting any affiliation between the companies;

    iv.  Requiring Defendants to return all UCM Trade Secrets, including all customer files, vendor data, business records, and other proprietary or confidential information in their possession, and destroy or delete all copies, records, facsimiles, or duplicates of such material;

    v.  Requiring Defendants to return all UCM Funds converted by Defendants; and

    vi.  Enjoin Defendants from using or disclosing any UCM Trade Secrets, including all customer, shipping, or vendor files, business records, and other proprietary or confidential information in their possession, and destroy or delete all copies, records, facsimiles, or duplicates of such material;

    vii.  Requiring Defendants to return to UCM all emails sent or forwarded to the "ucmchs.com" email domain that are in Defendants' possession, and destroy or delete all copies of such emails in Defendants' possession.

B. Compensatory damages in an amount to be proven at trial;

C.  Restitution to Plaintiff of profits derived from Defendants' unjust enrichment;

D.  Statutory penalties;

E.  Attorney's fees as provided by applicable statutory provisions;

F.  Punitive damages as provided for by code, where Defendants' conduct is shown to be outrageous, oppressive, and malicious by clear and convincing evidence;

G.  For such other and further relief as the Court deems just and proper.

Dated:  April 23, 2025          MANATT, PHELPS & PHILLIPS, LLP


                                By: */s/ Charles E. Weir*
                                    Charles E. Weir
                                    Colin M. McGrath
                                    *Attorneys for Plaintiff*
                                    UNITED CARGO MANAGEMENT, INC.

## **DEMAND FOR JURY TRIAL**

Plaintiff United Cargo Management, Inc. respectfully demands trial by jury.


Dated:  April 23, 2025          MANATT, PHELPS & PHILLIPS, LLP



By: */s/ Charles E. Weir*
_____
Charles E. Weir
Colin M. McGrath
*Attorneys for Plaintiff*
UNITED CARGO MANAGEMENT INC.